**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2572-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

CHRISTOPHER C. SCHWARTZ,
a/k/a CHOYCE SCHWARTZ,
CHRISTOPH SCHWARTZ,
CHRISTOPH C. SCHWARTZ,
CHRISTOPHER SCHWARTZ and
CHRISTOPHER CHOYCE
SCHWARTZ.

     Defendant-Appellant.

_____

Argued May 19, 2021 – Decided June 25, 2021

Before Judges Geiger and Mitterhoff.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment Nos: 15-11-1962 and 15-12-2070.

Zachary G. Markarian, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Susan L. Romeo,

Assistant Deputy Public Defender, of counsel and on the brief).

Sarah D. Brigham, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Sarah D. Brigham, of counsel and on the brief).

PER CURIAM

Defendant Christopher C. Schwartz was indicted on charges resulting from two separate narcotics investigations. He appeals from a November 15, 2016 order denying his motion to suppress physical evidence seized from his person and vehicle under Ind. No. 15-12-2070, and the twenty-year mandatory minimum extended term sentence imposed on count twenty-four of Ind. No. 15-11-1962. We affirm the denial of the suppression motion and defendant's convictions but reverse defendant's sentence on count twenty-four, and remand for resentencing of that count.

We derive the following facts from the record. In relation to Ind. No. 15-11-1962, defendant was the subject of a narcotics investigation in Neptune Township. Defendant sold heroin to an undercover detective on six occasions between May 14 and June 17, 2015. In the aggregate, defendant sold more than one-half ounce of heroin packaged in seventeen bricks, in exchange for more

than $3000.  Distribution of one-half ounce or more of heroin is a second-degree crime.  N.J.S.A. 2C:35-5(b)(2).

On November 17, 2015, a Monmouth County grand jury returned Ind. No. 15-11-1962, charging defendant in connection with a series of undercover buys with the following offenses:  six counts of third-degree possession of a controlled dangerous substance (CDS), N.J.S.A. 2C:35-10(a)(1) (counts one, six, eleven, fourteen, seventeen, and twenty); six counts of third-degree possession of CDS with intent to distribute, N.J.S.A. 2C:35-5(b)(3) (counts two, seven, twelve, fifteen, eighteen, and twenty-one); six counts of third-degree distribution of heroin, N.J.S.A. 2C:35-5(b)(3) (counts three, eight, thirteen, sixteen, nineteen, and twenty-two); two counts of third-degree possession of CDS with intent to distribute within 1000 feet of school property, N.J.S.A. 2C:35-7 (counts four and nine); two counts of third-degree distribution of CDS within 1000 feet of school property, N.J.S.A. 2C:35-7 (counts five and ten); second-degree possession of CDS with intent to distribute, N.J.S.A. 2C:35-5(b)(2) (count twenty-three); and second-degree distribution of CDS, N.J.S.A. 2C:35-5(b)(2) (count twenty-four).  The State dismissed counts four, five, nine, and ten before trial.

In relation to Ind. No. 15-12-2070, the trial court made the following factual findings based on the testimony and evidence adduced during the suppression hearing. On August 24, 2015, Detective Joseph Spitale of the Long Branch Police Department's Street Crime Unit received a tip from a reliable confidential informant (CI) that a man nicknamed "Choyce," later identified as defendant, possessed a large quantity of heroin, which he stored in various locations. The CI confirmed that Choyce was the person depicted in a photograph of defendant.

That same day, Spitale received additional information from the same CI that Choyce would be driving his gray, four-door Kia Optima with a temporary license plate and "arriving momentarily" to deliver heroin to an unknown resident of a particular residence on Atlantic Avenue in Long Branch. Long Branch Detectives Spitale, Nicholas Romano, and Richard O'Brien proceeded to and surveilled that area in unmarked vehicles. The detectives observed a car matching the description given by the CI driving north on Long Branch Avenue and Spitale began following it. Defendant was later identified by Spitale, who knew defendant from previous investigations, as the driver of the Kia Optima.

At one point, defendant made a left turn onto Atlantic Avenue. O'Brien observed defendant drive slowly by and stare directly at the residence located at

the address specified by the CI. After a series of turns, defendant turned left without using a turn signal, causing Spitale to apply his brakes. Spitale, who was driving directly behind defendant, observed that the Kia's license plate was obstructed by a bracket.

Based on these motor vehicle violations, Spitale initiated a motor vehicle stop of the Kia. Spitale then approached the open driver's side window as Romano approached the passenger's side. Spitale looked down at defendant's feet and noticed rectangular packages wrapped in pornographic magazine paper between defendant's right foot and the base of the center console. Based on his training and experience dealing with similarly wrapped packages, Spitale believed the packages contained heroin.

Spitale told defendant to exit the vehicle, which he did. Spitale then picked up and examined one of the packages and concluded it contained heroin, which was packaged in 250 glassine bags. Defendant was arrested. "A search incident to arrest revealed defendant had a folded $20 bill containing white [powder believed to be cocaine] in the right front pocket of his shorts." "Spitale recovered an additional $753 in various denominations" from the same pocket. Spitale also recovered three cell phones from defendant's left pocket. From

5

training and experience, Spitale knew that drug dealers frequently used multiple cell phones to carry out their crimes.

The Kia was towed to police headquarters. A K-9 drug sniffing dog conducted an exterior sniff of the Kia and detected the presence of narcotics inside the car. The Kia was then impounded at the Department's impound yard.

Spitale looked up defendant's criminal history, which revealed he had eight indictable convictions and was on parole. Spitale applied for and obtained a search warrant for the Kia. During the execution of the warrant, Spitale, O'Brien, and Romano found suspected cocaine inside the front driver's side door panel and a plastic bag in the trunk containing suspected heroin packaged in over 100 bricks containing 5112 wax envelopes.

On December 1, 2015, a Monmouth County grand jury returned Ind. No. 15-12-2070, charging defendant with the following offenses: third-degree possession of cocaine, N.J.S.A. 2C:35-10(a)(1) (count one); third-degree possession of heroin, N.J.S.A. 2C:35:10(a)(1) (count two); second-degree possession with intent to distribute heroin, N.J.S.A. 2C:35:5(b)(2) (count three); third-degree possession with intent to distribute heroin within 1000 feet of school property, N.J.S.A. 2C:35-7 (count four); and second-degree possession

with intent to distribute heroin within 500 feet of a public park, N.J.S.A. 2C:35-7.1 (count five).

On March 24, 2016, defendant moved to suppress the evidence seized from his person and car, arguing: (1) the traffic stop was unlawful because no motor vehicle violations occurred; (2) it was not a valid investigatory stop because the police did not observe any criminal activity; (3) the seizure of the package from the floor of the Kia was not permissible under the plain view doctrine; and (4) the search incident to arrest was unlawful because the traffic stop was impermissible. The State argued: (1) the detectives conducted a proper investigatory stop; (2) the traffic stop was justified by defendant's motor vehicle infractions; (3) the suspected CDS was in plain view; (4) probable cause existed for defendant's arrest; and (5) the search incident to arrest was valid.

The court conducted a two-day evidentiary hearing and issued a November 15, 2016 order and twenty-page opinion denying the motion. The court found there were insufficient facts for Spitale to have an objectively reasonable, articulable suspicion that defendant was about to engage in a narcotics transaction to justify an investigatory stop. It found, however, that Spitale made a valid traffic stop because defendant failed to signal a turn, which caused Spitale to apply his brakes, thereby affecting traffic, in violation of

A-2572-18

N.J.S.A. 39:4-126, and the words "New Jersey" and the expiration date on the temporary registration were obscured, in violation of N.J.S.A. 39:3-33.

The court then found that the plain view doctrine applied because the traffic stop was valid, Spitale was lawfully present in the viewing area, he inadvertently discovered the suspected CDS, and he knew, based on his training and experience, that the packages he saw on the vehicle's floor were bricks of heroin. Spitale, thus, had probable cause to arrest defendant for possession of CDS. Therefore, the search incident to arrest was valid and the items discovered during that search were lawfully seized.

The consolidated trial of both indictments commenced on June 6, 2018. The next day, defendant entered into a global plea agreement with the State, entering an open plea to the remaining counts of both indictments. Because it was an open plea, the plea agreement contained no recommended sentence, but the State agreed that the sentences would all run concurrently and that it would not oppose defendant's application for equitable jail credit. However, the State reserved its right to move for a mandatory extended term on Ind. No. 15-11-1962.

On September 20, 2018, the State moved under N.J.S.A. 2C:43-6(f) for a mandatory extended term on Ind. No. 15-11-1962. Its moving papers revealed

that defendant was forty-four years old at the time of the offenses and had been previously convicted of the following offenses: two counts of third-degree possession of CDS with intent to distribute in 1997; first-degree possession of CDS with intent to distribute in 1998; third-degree possession of CDS with intent to distribute in a school zone and second-degree possession of CDS with intent to distribute in 2003; and first-degree robbery in 2008. The State did not move for a discretionary extended term as a persistent offender under N.J.S.A. 2C:44-3(a).

On November 30, 2018, the court heard the State's motion for an extended term and sentenced defendant. The State noted that its final plea offer was an aggregate sixteen-year term, subject to an eight-year period of parole ineligibility, which defendant rejected. It argued that defendant's prior convictions triggered mandatory extended term sentencing under N.J.S.A. 2C:43-6(f), exposing defendant to a maximum extended term of twenty years, subject to a ten-year period of parole ineligibility.

The State emphasized that during the six undercover buys, defendant sold "at least 17 bricks, or approximately 850 bags of heroin to an undercover officer." In addition, the search of defendant's car revealed approximately 102 bricks or 5112 bags of heroin. The State contended that while defendant claimed

9

he had an ongoing substance abuse problem, and the amount of cocaine seized was for personal use, he distributed heroin for profit. It noted defendant's repeated attempts to enter Drug Court were unsuccessful due to the disqualifying first-degree robbery conviction that he committed following his early release from prison.

The State contended that heroin distribution was a nationwide plague that adversely impacted Monmouth County. It sought both the maximum term and maximum period of parole ineligibility on count twenty-four.

The State acknowledged that the court was precluded from imposing an extended term on Ind. No. 15-12-2070, because two extended terms could not be imposed on the same date. It did not oppose defendant's application for equitable jail credit.

Defendant, who was then representing himself with standby counsel, argued that he had struggled with alcohol and drug abuse since age eleven and grew up in a dysfunctional household. Defendant claimed he availed himself of every program the prison offered. When placed in a half-way house, he attended and graduated from Union County College with honors. He claimed that the residential substance abuse program he attended after release from prison was

religion-based and did not clinically address his substance abuse. His multiple attempts to enter Drug Court were rejected.

Defendant pointed out that some of his convictions were now decades old. He noted that he had no juvenile adjudications, incurred no disciplinary charges or sanctions while incarcerated, and had only one parole violation.

Defense counsel added that while imprisoned, defendant was diagnosed with anxiety and depression and is continuing to receive mental health counseling. Counsel argued that long-term incarceration would not provide defendant with the mental health and substance abuse treatment he needed. Counsel emphasized that the heroin involved in the undercover buys only reached second-degree weight by aggregating all six buys. He argued that there was no evidence that defendant was a drug kingpin or that he was armed during the undercover buys. Rather, defendant was a long-term substance abuser who sold drugs to support his habit.

Defendant argued that the court should apply mitigating factors two ("defendant did not contemplate that his conduct would cause or threaten serious harm"), N.J.S.A. 2C:44-1(b)(2), and three ("defendant acted under a strong provocation"), N.J.S.A. 2C:44-1(b)(3). He claimed the drug sales were to support his habit.

11

In his sentencing analysis, the judge incorrectly referred to N.J.S.A. 2C:44-3(a), and its interpretive caselaw, which pertains to discretionary extended terms for persistent offenders, rather than N.J.S.A. 2C:43-6(f), which pertains to mandatory extended terms. Despite that mix-up, at several points the court referred to the extended term as being mandatory, noting "this is not a discretionary extended term" and "based on [defendant's] convictions, [was] satisfied that a mandatory extended term [was] applicable in this case based on the facts and circumstances . . . ." The court, nonetheless, applied the four-step process for discretionary extended term sentences set forth in State v. Dunbar, 108 N.J. 80, 89 (1987), and deemed a mandatory extended term was appropriate.

The court found aggravating factors three (risk of reoffending), six ("prior criminal record and the seriousness of [current] offenses"), and nine ("need for deterring the defendant and others from violating the law"). N.J.S.A. 2C:44-1(a)(3), (6), and (9). Relying on State v. Pierce, 188 N.J. 155 (2006), the court emphasized the "need for the protection of the public and its society" and that "[d]efendant has demonstrated that he is a true menace to society and further that the public will only be safe from the [d]efendant if he is in jail."

The court found no mitigating factors. It rejected mitigating factor two, finding that if defendant did not contemplate that his conduct would cause or

threaten serious harm, "he should have."  The court also rejected mitigating factor three, finding defendant did not act under a strong provocation.  It found the aggravating factors substantially outweighed the mitigating factors.

On Ind. No. 15-11-1962, the State conceded that counts one through three, six through eight, and eleven through twenty-three should be merged into count twenty-four.  The court agreed, merged those counts for purposes of sentencing, and sentenced defendant to the maximum possible sentence, an extended twenty-year term with ten years of parole ineligibility.

On Ind. No. 15-12-2070, the State conceded that count two should be merged into count three.  The court agreed, merged that count for purposes of sentencing, and sentenced defendant to the following:  a five-year term on count one; a ten-year term on count three; a five-year term, subject to a three-year period of parole ineligibility, on count four; and a ten-year term on count five. All terms on both indictments ran concurrently, yielding an aggregate twenty-year term, subject to a ten-year period of parole ineligibility.

On appeal, defendant raises the following points for our consideration:

POINT I

THE TRIAL COURT'S DENIAL OF DEFENDANT'S MOTION IN IND. NO. 15-12-2070 TO SUPPRESS EVIDENCE SEIZED FROM HIS AUTOMOBILE WITHOUT A WARRANT MUST BE REVERSED

13

BECAUSE, AS A MATTER OF LAW, THE PLAIN VIEW DOCTRINE CANNOT APPLY WHERE THE OFFICER ADMITTED THAT HE HAD NO PROBABLE CAUSE TO SEIZE THE PACKAGE UNTIL HE HAD REMOVED IT FROM THE AUTOMOBILE AND UNWRAPPED IT TO SEE WHAT WAS INSIDE.

POINT II

DEFENDANT'S SENTENCE ON IND. NO. 15-11-1962 MUST BE REVERSED BECAUSE THE COURT: 1) ERRED BY APPLYING THE STANDARDS FROM THE PERSISTENT OFFENDER LAW, RATHER THAN THE EXTENDED TERM, FOR DRUG OFFENSES SOUGHT BY THE PROSECUTOR; AND 2) ABUSED ITS DISCRETION BY IMPOSING THE MAXIMUM 20-YEAR TERM, AND 10-YEAR PERIOD OF PAROLE INELIGIBILITY, WHERE THE EVIDENCE SHOWED THAT DEFENDANT WAS NOT A DRUG KINGPIN BUT, RATHER, WAS A DRUG ADDICT WHO REPEATEDLY SOUGHT HELP FOR HIS ADDICTION AND WHOSE PREDICATE CONVICTIONS WERE ALMOST TWO DECADES OLD.

1. The Allegations in Ind. No. 15-11-1962.

2. Defendant's Sentence Must Be Reversed Because the Trial Court Applied the Wrong Law in Considering the State's Motion for a Mandatory Extended Term in Ind. No. 15-11-1962.

3. The Trial Court Abused Its Discretion When It Sentenced Defendant to the Maximum Base Term and the Maximum Parole Disqualifier.

14

We first address defendant's argument that the drugs seized without a warrant following the traffic stop were not admissible under the plain view doctrine. We are unpersuaded.

We apply the following standard of review when considering a trial court's ruling on a motion to suppress evidence:

> We are bound to uphold a trial court's factual findings in a motion to suppress provided those "findings are 'supported by sufficient credible evidence in the record.'" Deference to those findings is particularly appropriate when the trial court has the "opportunity to hear and see the witnesses and to have the feel of the case, which a reviewing court cannot enjoy." Nevertheless, we are not required to accept findings that are "clearly mistaken" based on our independent review of the record. Moreover, we need not defer "to a trial . . . court's interpretation of the law" because "[l]egal issues are reviewed de novo."
>
> [State v. Watts, 223 N.J. 503, 516 (2015) (second alteration in original) (citations omitted).]

On appeal, defendant does not challenge the trial court's finding that Spitale made a valid traffic stop based on defendant's failure to signal a left turn, in violation of N.J.S.A. 39:4-126, and that the words "New Jersey" and the expiration date on the temporary license plate were obscured by a bracket, in violation of N.J.S.A. 39:3-33.

"Both the United States and the New Jersey Constitutions protect citizens against unreasonable searches and seizures." State v. Amelio, 197 N.J. 207, 211 (2008) (citing U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7). Generally, "a warrant based on probable cause must be issued prior to any search or seizure." State v. Harris, 211 N.J. 566, 581 (2012). "A warrantless search [or seizure] is presumed invalid unless it falls within one of the recognized exceptions to the warrant requirement." State v. Cooke, 163 N.J. 657, 664 (2000) (alteration in original) (quoting State v. Moore, 181 N.J. 40, 44 (2004)). "[T]he State bears the burden of proving by a preponderance of the evidence that a warrantless search or seizure falls within one of the few well-delineated exceptions to the warrant requirement." State v. Mann, 203 N.J. 328, 337-38 (2010) (quoting State v. Elders, 192 N.J. 224, 246 (2007)). One such exception is when evidence of a crime or contraband is in an officer's "plain view." Harris, 211 N.J. at 581 (citing State v. Bruzzese, 94 N.J. 210, 235-26 (1983), overruled in part on other grounds, State v. Gonzales, 227 N.J. 77 (2016)).

The plain view exception allows seizures without a warrant so long as an officer is "lawfully . . . in the area where he observed and seized the incriminating item or contraband, and it [is] immediately apparent that the seized item is evidence of a crime." Gonzales, 227 N.J. at 101. "[A] police

officer must have 'probable cause to associate the [item] with criminal activity.'" State v. Johnson, 171 N.J. 192, 207 (2002) (quoting Texas v. Brown, 460 U.S. 730, 740 (1983)). "All the officer needs to meet this requirement is '[a] "practical, nontechnical" probability that incriminating evidence is involved.'" Ibid. (alteration in original) (quoting Brown, 460 U.S. at 742).

On appeal, defendant does not challenge the court's finding that Spitale was lawfully in the viewing area—standing outside the driver's side window—when he viewed a package on the floor between defendant's right foot and the console, and that his discovery of the packages was inadvertent. Instead, he contends it was not "immediately apparent" that the package wrapped in pornographic magazine paper contained narcotics and that Spitale lacked probable cause to seize the packages.

Where an officer associates an "intrinsically innocent" object with criminal activity based on the officer's experience and training, "the officer must be able to explain sufficiently the basis of that opinion, so that it 'can be understood by the average reasonably prudent person.'" State v. Demeter, 124 N.J. 374, 382 (1991) (quoting W. LaFave, Search and Seizure, § 3.2(c) (1987)). For example, in Demeter, during a traffic stop, an officer observed a black opaque film cannister lying in the front console. 124 N.J. at 378. Without seeing

a camera in the van, the officer asked to see the cannister, which contained marijuana. Ibid. At the suppression hearing, the officer testified that in his seven years of experience, at least half of drug incidents involved the use of small film cannisters to store narcotics. Id. at 379. The officer did not have any other information that the cannister contained narcotics. Ibid. The Court found the cannister "appear[ed] intrinsically innocent." Id. at 383. "Neither the configuration nor the design of such a container 'proclaims its contents.'" Ibid. The Court held that an opaque film cannister without a showing of "regularized police experience" that such an object would contain narcotics is insufficient to establish the item's criminality was immediately apparent. Id. at 385-86.

In contrast, in Brown, an uninflated, opaque party balloon was found so probative of a criminal purpose under the circumstances that it provided police with probable cause to justify the warrantless seizure. Brown, 460 U.S. at 730. There, the officer testified that, based on his experience, narcotics were frequently stored in balloons, and that he had seen plastic vials, loose white powder, and additional balloons in the car that raised his suspicion. Ibid.

Defendant argues that like the film canisters in Demeter, the packages wrapped in pornographic magazine paper were intrinsically innocent, and that Spitale's "mere belief" that the packages contained narcotics is insufficient to

18

establish probable cause. Defendant relies heavily on Spitale's testimony regarding when he believed he had probable cause to arrest defendant for possession of heroin. That portion of Spitale's testimony concerning his subjective belief is not controlling and should not be viewed in isolation. See Gonzales, 227 N.J. at 98 (reciting the longstanding principle "that the reasonableness of a police action under the Fourth Amendment is viewed objectively, based on the circumstances of the particular search or seizure, 'regardless of the individual officer's state of mind'") (quoting Brigham City v. Stuart, 547 U.S. 398, 404 (2006)). That same principle applies with equal force under Article I, Paragraph 7 of our State Constitution. Id. at 98-99.

"[A] police officer's search and seizure would be considered reasonable only if it conformed to 'an objective standard of reasonableness.'" Demeter, 124 N.J. at 384 (quoting State v. Reldan, 100 N.J. 187, 202 (1985)). "Thus, the subjective beliefs of the officer, even if justified by his personal circumstances, are not dispositive. Rather, what is dispositive are the objective factors that would lead any officer with similar training and experience reasonably to conclude that drugs were in the [packages]." Ibid.

"Probable cause requires 'a practical, common-sense decision whether, given all the circumstances . . . there is a fair probability that contraband or

evidence of a crime will be found in a particular place.'" Id. at 380-81 (quoting

Illinois v. Gates, 462 U.S. 213, 238 (1983); State v. Novembrino, 105 N.J. 95,

117-18 (1987)). "Some objects or containers, although by themselves not

sufficiently probative of criminal activity, may by their configuration or design

proclaim their contents to an observer." Id. at 381. "[A] police officer lawfully

in the viewing area" need not "close his eyes to suspicious evidence in plain

view." Johnson, 171 N.J. at 207 (quoting Bruzzese, 94 N.J. at 237).

The State has met its burden in this case. The bricks of heroin wrapped

in pornographic magazine paper were not "intrinsically innocent." Their distinct

size, shape, and wrapping did not lend to the packages' innocence. Rather, to a

trained and experienced eye, they proclaimed their contents. Based on his

training and experience, Spitale "immediately" recognized the packages as

bricks of heroin, which are "commonly packaged in pornographic material,

magazine paper." In addition, Spitale received a tip from a reliable CI that

defendant would be driving the exact make, model, and color car defendant was

driving to deliver heroin in the precise area in which defendant was observed,

driving slowly past and looking at the exact address provided by the CI.

These combined objective circumstances would lead "a comparably well-

trained police officer" to reasonably conclude by a "fair probability" that the

packages defendant was attempting to conceal contained narcotics. Demeter, 124 N.J. at 386. We therefore find the State established probable cause. We conclude that the plain view exception to the warrant requirement applies, and that the seizure of the packages was lawful, as was the search of defendant's person incident to arrest. Hence, the trial court properly denied the motion to suppress.

We next address defendant's sentencing arguments. The Comprehensive Drug Reform Act of 1987 (CDRA), N.J.S.A. 2C:35-1 to 36A-1, L. 1987, c. 106, requires extended mandatory minimum terms for certain enumerated offenses based on the defendant's prior drug convictions. Under the CDRA, a person convicted of distributing CDS, "who has been previously convicted of manufacturing, distributing, dispensing or possessing with intent to distribute [CDS] . . . shall upon application of the prosecuting attorney be sentenced by the court to an extended term as authorized by section c. of N.J.S.A. 2C:43-7, notwithstanding that extended terms are ordinarily discretionary with the court." N.J.S.A. 2C:43-6(f). In addition, "[t]he term of imprisonment shall, except as may be provided in N.J.S.A. 2C:35-12, include the imposition of a minimum term . . . fixed at, or between, one-third and one-half of the sentence imposed by the court[,] . . . during which the defendant shall be ineligible for parole." Ibid.

Defendant does not argue he was ineligible for a mandatory extended term under N.J.S.A. 2C:43-6(f). Rather, he argues that resentencing is required because the court erred by mistakenly considering the factors applicable to a discretionary extended sentence and abused its discretion by excessively sentencing him to both the maximum base term and the maximum period of parole ineligibility permitted under the statute. For the following reasons, we agree.

The sentencing range for an extended term on a second-degree offense is from ten to twenty years. N.J.S.A. 2C:43-7(a)(3). The parole ineligibility period "shall be fixed at, or between, one-third and one-half of the sentence imposed . . ." N.J.S.A. 2C:43-6(f); N.J.S.A. 2C:43-7(c). Here, defendant was sentenced to the maximum permitted under the statute, a twenty-year term with a ten-year period of parole ineligibility. He was forty-four years old when he committed the offenses and forty-six when sentenced.

"Appellate review of sentencing decisions is relatively narrow and is governed by an abuse of discretion standard." State v. Blackmon, 202 N.J. 283, 297 (2010). "[A] appellate court must not 'substitute its judgment for that of the sentencing court.'" State v. Liepe, 239 N.J. 359, 370 (2019) (quoting State v. Fuentes, 217 N.J. 57, 70 (2014)).

> Appellate review is thus limited to consideration of:
>
> (1) whether guidelines for sentencing established by the Legislature or by the courts were violated; (2) whether the aggravating and mitigating factors found by the sentencing court were based on competent credible evidence in the record; and (3) whether the sentence was nevertheless "clearly unreasonable so as to shock the judicial conscience."
>
> [Ibid. (quoting State v. McGuire, 419 N.J. Super. 88, 158 (App. Div. 2011)).]

Employing those standards, we will remand for resentencing in "those situations in which the application of the facts to the law has resulted in a clear error of judgment or a sentence that 'shocks the judicial conscience.'" Blackmon, 202 N.J. at 297 (citing Roth, 95 N.J. at 363-65). Even prior to the adoption of the Criminal Code, our courts modified sentences that were manifestly excessive, although within statutory limits. Roth, 95 N.J. at 361.

The State did not move for a discretionary extended term. A discretionary extended term may only be imposed "upon application of the prosecuting attorney." N.J.S.A. 2C:44-3. Moreover, "N.J.S.A. 2C:44-5(a)(2) bars the imposition of a discretionary extended term and a mandatory extended term in the same sentencing proceeding." State v. Robinson, 217 N.J. 594, 610 (2014). The court nevertheless applied the four-step process for discretionary extended term sentences adopted in Dunbar, 108 N.J. at 89, in finding that a mandatory

23

extended term was appropriate. Although the imposition of a discretionary extended sentence is more circumscribed, and imposition of an extended term sentence was mandated by N.J.S.A. 2C:43-6(f), the judge erred to the extent that he considered defendant a persistent offender by applying the Dunbar factors in determining the length of the term and period of parole ineligibility he imposed. The judge also erred by relying on Pierce, which likewise involved the sentencing of a persistent offender under N.J.S.A. 2C:44-3(a). 188 N.J. at 158.

Here, the record supports the application of aggravating factors three, six, and nine, and the rejection of mitigating factors two and three. The court correctly found that mitigating factor two does not apply to the distribution of heroin at the levels involved here. Cf. State v. Cullen, 351 N.J. Super. 505, 511 (App. Div. 2002) (finding that mitigating factor two applied to possession of .33 grams of cocaine). The court also correctly found that mitigating factor three did not apply. Mitigating factor three is limited to "strong provocation" caused by the "acts of the victim, not mental compulsions of the defendant even if they are causative factors." Cannel, N.J. Criminal Code Annotated, cmt. 5 on N.J.S.A. 2C:44-1 (2020) (citing State v. Jasuilewicz, 205 N.J. Super. 558, 576 (App. Div. 1985)). Although the court did not express the qualitative weight

applied to each aggravating factor, it properly concluded that the aggravating factors substantially outweighed the non-existent mitigating factors.

Typically, "when the aggravating factors preponderate, sentences will tend toward the higher end of the range." Fuentes, 217 N.J. at 73 (quoting State v. Natale, 184 N.J. 458, 488 (2005)).  However, a sentencing court must consider "the nature and circumstances" of the offenses and the "history and characteristics" of the defendant. Id. at 72.  "Thus, a judge may impose sentence lower than that recommended by the prosecutor, but not less than [the] mandatory minimum." Cannel, cmt. 6 on N.J.S.A. 2C:44-1 (citing State v. Press, 176 N.J. 68 (2003)).

The court must also consider the real time consequences of a sentence imposing a period of parole ineligibility "in determining the appropriate term of imprisonment."  N.J.S.A. 2C:44-1(c)(2).  Here, the court imposed both the maximum permissible term and the maximum permissible period of parole ineligibility.  It did not express any consideration of the fact that defendant will be sixty-four years old when he serves his entire term and fifty-four years old when he first becomes eligible for parole.

While defendant had qualifying prior convictions, some were entered prior to 2000.  The court did not address the remoteness of some of those

convictions, defendant's long-standing substance abuse that began when he was only eleven years old, and that he has not received clinically based substance abuse treatment for his opiate addiction and reported daily use of cocaine and marijuana. Moreover, while defendant was guilty of second-degree distribution, the court did not respond to defendant's argument that on count twenty-four, second-degree weight was only reached by aggregating the weight of the heroin sold on all six undercover buys.

We further note that these were all non-violent drug offenses and there is no evidence that defendant was armed during the commission of any of the offenses. Nor is there any evidence that the heroin he sold was laced with Fentanyl. Moreover, count twenty-four was prosecuted as a second-degree offense by aggregating the weight of the heroin sold during the six undercover buys that occurred from May 14, 2015 to June 17, 2015.[1] While the weight of individual acts of distribution "may be aggregated in determining the grade of the offense," N.J.S.A. 2C:35-5(c), the record does not demonstrate that defendant possessed second-degree weight of heroin on any single date or that he was more than a street level dealer. The State does not argue that defendant

---

[1] Each of the six undercover buys involved third-degree weight. No two sales occurred on the same date; they all took place at least three days apart.

A-2572-18

was a "kingpin" or distributed large quantities of heroin to other dealers, as opposed to being a street level dealer. See N.J.S.A. 2C:35-1.1(c) (stating the need to target and impose enhanced punishment on "upper echelon members of organized narcotics trafficking networks who pose the greatest danger to society" and the policy "to distinguish between drug offenders based on . . . the role of the actor in the overall drug distribution network").

The ten-year period of parole ineligibility sought by the State and imposed by the court far exceeded the maximum period of parole ineligibility permitted for plea offers by the Revised Brimage Guidelines[2] under the circumstances of this case.[3] While the Guidelines apply to prosecutors during plea negotiations and not courts during sentencing on an open plea, the ten-year period of parole ineligibility was nearly double the limit imposed on prosecutors by the Guidelines, which were adopted to reduce sentencing disparity.

---

[2] Revised Attorney General Guidelines for Negotiating Cases Under N.J.S.A. 2C:35-12 (July 15, 2004), promulgated pursuant to State v. Brimage, 153 N.J. 1 (1998). The Brimage Guidelines were originally adopted by the Attorney General in 1998 to provide uniform plea agreement guidelines regulating a defendant's exposure to mandatory minimum terms in drug cases.

[3] Considering that defendant was unarmed during the offenses but on parole, and his prior drug convictions, the maximum period of enhanced parole ineligibility under the Guidelines for count twenty-four was sixty-three months. See Brimage Guidelines, Table 2, Row E, Column 5.

We would be remiss if we did not discuss recent developments regarding the sentencing of non-violent drug offenders to mandatory minimum terms that impose lengthy periods of parole ineligibility. The Legislature, Governor, Attorney General, and New Jersey Criminal Sentencing & Disposition Commission have voiced strenuous objections to such sentences or taken affirmative steps to curb or eliminate them. See S. 3456 (2021)[4] (eliminating mandatory sentences for non-violent drug offenses); Governor Murphy Convenes the Criminal Sentencing and Disposition Commission (Feb. 11, 2018)[5] (convening the Commission "to examine racial and ethnic disparities in the state's criminal justice system" and to review sentencing laws and recommend reforms); New Jersey Criminal Sentencing and Disposition Commission Annual Report at 21-23 (Nov. 2019) (recommending elimination of mandatory minimum sentences for non-violent drug crimes, including those imposed on recidivists under N.J.S.A. 2C:43-6(f)); Attorney General Law Enforcement Directive No. 2021-4, Directive Revising Statewide Guidelines

---

[4]  Although passed by both houses of the Legislature, Governor Murphy conditionally vetoed S. 3456 because an amendment eliminated mandatory sentences for official misconduct, including those involving bribery and corruption. Governor's Veto Statement to S. 3456 (Apr. 19, 2021).

[5]  https://www.nj.gov/governor/news/562018/.

A-2572-18

Concerning the Waiver of Mandatory Minimum Sentences in Non-Violent Drug Cases Pursuant to N.J.S.A. 2C:35-12 at 5 (Apr. 19, 2021) ("establish[ing] statewide rules that require prosecutors to seek the waiver of mandatory parole disqualifiers for non-violent drug crimes during plea negotiations, following a probation violation, and after conviction at trial").

As noted by the Attorney General: "The Governor and legislative leaders endorsed [the Sentencing Commission's] proposals, as did the Public Defender, the Attorney General, and all [twenty-one] County Prosecutors." Directive No. 2021-4 at 5. Notably, the Directive requires prosecutors to offer defendants convicted after trial "the opportunity to enter into an agreement prior to sentencing" pursuant to N.J.S.A. 2C:35-12 that imposes ordinary parole eligibility, including application of "commutation, minimum custody, and work credits earned while in custody."[6] Id. at 7. The Directive took effect on May 19, 2021. Id. at 10. The clear mandate of Directive 2021-4 is to largely eliminate plea negotiations for periods of parole ineligibility formally countenanced by the revised Brimage Guidelines. This further demonstrates the excessiveness of the ten-year period of parole ineligibility defendant received.

---

[6] The prosecutor may still seek an extended term under N.J.S.A. 2C:35-12, and the sentencing court retains authority to impose a discretionary period of parole ineligibility pursuant to N.J.S.A. 2C:43-6(b). Id. at 7-8.

Of particular concern was the widely disparate impact of mandatory minimum sentences on defendants of color and the dramatically increased prison population that resulted from the CDRA and other mandatory minimum provisions. 2019 Comm'n Rep. at 13-17, 19-21.[7]

"Appellate review remains the final check on the discretion allotted to the sentencing court." State v. Torres, ___ N.J. ___, ___ (2021) (slip op. at 26). Considering the non-violent nature of the offense, which was committed while defendant was unarmed, and the totality of the underlying circumstances, including defendant's longstanding substance abuse and the aggregation of the weight of the heroin distributed in sales over the course of thirty-four days, we find that the sentence imposed on count twenty-four of Ind. No. 15-11-1962 is manifestly excessive, unduly punitive, and shocks our judicial conscience. We remand for resentencing of that count.

---

[7] The report noted that "in 1982, only 11% of prisoners in New Jersey had mandatory minimum terms; in 1987 the number rose to 44%; and in 2015, the number jumped to 74%." 2019 Commission Report at 19. "Blacks comprise 14% of the residents in our State, but 61% of the inmate population, and despite a decrease in overall prison population since 1999, the percentage of prisoners who are Black has remained relatively consistent over time. A fair justice system cannot tolerate such disparity." Id. at 19-20. Perhaps even more telling, "the incarceration rate for black people is twelve times the white incarceration rate (i.e., a 12:1 ratio), the highest disparity of any state in the nation." Id. at 4.

A-2572-18

We do not disturb the sentence imposed on Ind. No. 15-12-2070. We note, however, that pursuant to Directive 2021-4, defendant may request the State to agree to file a joint application under Rule 3:21-10(b)(3), to rescind the three-year period of parole ineligibility imposed on count four of Ind. 15-12-2070, a non-violent drug offense.[8] Directive No. 2021-4 at 8.

Affirmed in part, reversed in part, and remanded for partial resentencing. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[8] We note that on May 26, 2021, Chief Justice Rabner entered an order assigning a judge on a statewide basis to handle all joint motions filed under N.J.S.A. 2C:35-12 and Rule 3:21-10(b)(3) relating to Directive No. 2021-4, including "limited jurisdiction to take appropriate action pursuant to Rule 2:9-1(a)," of such motions in cases currently on direct appeal.